886 F.2d 1381
 WASHINGTON URBAN LEAGUE, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Baltimore Gas and Electric Company, Columbia Gas
Transmission Corporation, and Washington Gas Light
Company, Intervenors.
 No. 88-3793.
 United States Court of Appeals,
Third Circuit.
 Argued May 26, 1989.
Decided Sept. 25, 1989.
As Amended Nov. 1, 1989.
Rehearing and Rehearing In Banc Denied Nov. 9, 1989.
 
 Morton L. Simons (argued), Simons & Simons, Charles E. Hill, Washington, D.C., for petitioner.
 Catherine C. Cook, Gen. Counsel, Joseph S. Davies (argued), Deputy Sol., Frank R. Lindh, F.E.R.C., Washington, D.C., for respondent.
 John H. Pickering, Timothy N. Black (argued), Gary D. Wilson, Susan D. McAndrew, Wilmer, Cutler & Pickering, Washington, D.C., Giles D.H. Snyder, Stephen J. Small, Richard L. Gottlieb, Columbia Gas Transmission Corp., Charleston, W.Va., for intervenor Columbia Gas Transmission Corp.
 Jennifer N. Waters, Toni M. Fine, Crowell & Moring, Washington, D.C., Lynne H. Church, Robert Fleishman, Baltimore Gas and Elec. Co., Baltimore, Md., for intervenor Baltimore Gas and Elec. Co.
 Before BECKER, STAPLETON, and GARTH, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge.
 
 
 1
 This petition for review of an order of the Federal Energy Regulatory Commission presents questions concerning the interaction of a 1986 FERC order involving the Gulf Oil Corp. (Gulf) and a 1985 FERC-approved settlement involving the Columbia Gas Transmission Corp. (Columbia). The 1986 Gulf order resulted in, among other things, a payment of $37 million to one of Gulf's customers, the Texas Eastern Transmission Co. (Texas Eastern). Texas Eastern, acting as a self-described "conduit" for these funds, passed them on to its customers, among them Columbia. Columbia, rather than passing on these funds to its customers, cited its 1985 settlement as allowing it to retain the funds. Washington Urban League (Urban League) represents consumers of the utilities to whom it argues Columbia ought to pass on the funds.[1]
 
 
 2
 The FERC ruled that Columbia is entitled to keep the Gulf funds to the extent allowed by Columbia's 1985 settlement, as interpreted by the FERC. We will deny the petition for review.
 
 I.
 
 3
 In 1963, Gulf[2] entered into a 26-year agreement with Texas Eastern whereby Gulf agreed to warrant the supply of certain quantities of natural gas at initial rates ranging between 19 and 20.987 cents per thousand cubic feet (Mcf), with subsequent rates specified in the agreement.[3] The Federal Power Commission (the predecessor of the Federal Energy Regulatory Commission, both referred to here as the Commission) approved the agreement in 1964 by issuing a certificate of public convenience to Gulf. Gulf began performance, but within a few years it was unable to meet its delivery obligations to Texas Eastern because it had greatly overestimated the reserves of the gas field from which it expected to obtain most of Texas Eastern's gas.
 
 
 4
 In October 1976, the Commission adopted a plan requiring Gulf to escrow funds representing the difference between the contract price of the undelivered gas and the Commission's ceiling price at the time of nondelivery multiplied by the difference between Texas Eastern's requests for gas and Gulf's deliveries. Gulf Oil Corp. & Texas Eastern Transmission Corp., 56 F.P.C. 2293, No. CI64-26 (Oct. 15, 1976). The Commission's order was affirmed by this court. Gulf Oil Corp. v. F.P.C. [Gulf Oil I], 563 F.2d 588 (3d Cir.1977).
 
 
 5
 The Commission articulated further details of the refund plan in a December 1981 order, and in January 1982, the Commission accepted Gulf's argument that it be allowed to deduct from the refunds amounts related to quantities of gas undelivered on account of force majeure. These two orders were consolidated for appeal to this court. We affirmed the Commission as to the details of the refund plan and reversed as to the Commission's allowance of deductions by Gulf on account of force majeure, Gulf Oil Co. v. F.E.R.C. [Gulf Oil III], 706 F.2d 444 (3d Cir.1983), remanding the case to the Commission.
 
 
 6
 On remand, the Commission ordered Gulf on June 6, 1986 to pay more than $18 million--representing amounts Gulf had sought to avoid on force majeure grounds--into the escrow account. The Commission further ordered Gulf to pay more than $37 million of interest to Texas Eastern. The June 6 order did not indicate the manner in which Texas Eastern was expected to dispose of the funds. Gulf Oil Corp., No. CI64-26-014, Order Revising Refund Plan in Part, Directing Payment of Refunds, and Scheduling Conference (June 6, 1986).
 
 
 7
 On June 24, 1986, Texas Eastern requested clarification from the Commission regarding the disposition of the $37 million it received from Gulf pursuant to the Commission's June 6 order. Texas Eastern requested the Commission to order it to "pay" certain designated amounts to its customers according to "allocation factors" previously approved by the Commission. App. at 12. Texas Eastern further requested the Commission to release it from any liability regarding the funds to either Chevron or Texas Eastern's customers. Urban League, as an intervenor in the proceeding, asked that the Commission direct four of the intended recipients of the $37 million being held by Texas Eastern to flow through the amounts apportioned to their customers. Among these intended recipients was Columbia, which in turn supplies utilities, or the distributors of utilities, that serve consumers represented by Urban League.
 
 
 8
 On July 16, the Commission approved Texas Eastern's disposition plan, refused to hold Texas Eastern harmless with regard to the funds, and denied Urban League's request. Regarding the latter, the Commission noted:
 
 
 9
 Urban League has not shown that it is reasonable or necessary for the Commission to address the manner in which the pipeline recipients of these funds should, in turn, make distributions. As a general matter, pipelines would flow through these refunds to their customers consistent with the PGA [purchased gas adjustment][4] and/or refund provisions of their respective FERC gas tariffs. The Commission accordingly declines to adopt Urban League's suggestion.
 
 
 10
 Gulf Oil Corp., No. CI64-26-014, Order Granting Clarification (July 16, 1986); App. at 19.
 
 
 11
 Urban League petitioned for rehearing. It was particularly concerned that Columbia would interpret its 1985 Commission-approved settlement as entitling it to retain rather than flow through the Gulf interest funds.
 
 
 12
 Columbia's 1985 settlement addressed Columbia's rate and rate-related FERC filings between 1981 and 1985. Columbia Gas Transmission Corp., 31 F.E.R.C. p 61,307 at 61674 (June 14, 1985). Although Urban League was absent at the proceedings culminating in the 1985 settlement, "virtually all," 31 FERC at 61,678, of Columbia's customers were parties, including intervenor Baltimore Gas & Electric Co., as well as many state consumer groups and state regulatory agencies.
 
 
 13
 The settlement contained certain provisions favorable to Columbia's customers and other provisions favorable to Columbia. As to the former, the settlement reduced Columbia's commodity rate by 12 percent and offered a two-year moratorium on rate increases. The Commission valued the savings to Columbia's customers from this provision to be over $628 million. In Article IV of the settlement, Columbia also agreed to forego entirely the future recovery of certain costs--up to $600 million--attributable to the 1985-87 settlement period.
 
 
 14
 As to provisions more favorable to Columbia, Article II provided for Columbia's retention of certain refunds:
 
 
 15
 Any commodity refunds received by Columbia applicable to periods prior to April 1, 1985, shall be retained by Columbia.... In addition, any commodity refunds received by Columbia applicable to the Settlement Period [April 1, 1985 to March 30, 1987] shall be retained by Columbia.
 
 
 16
 Columbia Gas Transmission Corp., Stipulation & Agreement at 9 (April 4, 1985); Br. of Respondent at C-12.
 
 
 17
 Article II was not wholly favorable to Columbia, however: Commodity refunds applicable to the pre-April 1, 1985 period were to be "used to offset any amounts which otherwise would be eligible for collection under Article IV hereof...." Id.
 
 
 18
 Having expressed its concern regarding this language from the Columbia settlement during a proceeding involving the approval of one of Gulf's settlement proposals, Urban League was given the opportunity by the Commission to present its arguments in a separate proceeding. Chevron U.S.A. Inc., Nos. CI64-26-012, 014, & 018 to 021, Order Approving Settlement at 10 (Dec. 31, 1986); App. at 106. The Commission ordered Columbia to file a petition for an order authorizing it to retain the Texas Eastern monies and allowed interested parties to file responses. Baltimore Gas & Electric Co. (Baltimore)--a customer of Columbia and an intervenor in this appeal--filed a motion to intervene and a response to Columbia's petition.
 
 
 19
 On June 2, 1988, the Commission entered the order appealed from here. The Commission, citing the language in Columbia's 1985 settlement regarding retention of "commodity refunds," stated that there were two issues: Whether the interest refunds are "commodity refunds" and whether the refunds are applicable to a period before April 1, 1985. The Commission resolved the first issue in the affirmative:
 
 
 20
 The monies that the Commission required Gulf to place in escrow represent overpayments of purchased gas costs that Texas Eastern, its customers, and ultimate consumers incurred for replacement gas as a result of Gulf's failure to deliver the volumes of gas called for under the warranty contract. Texas Eastern allocated the excess purchased gas costs to the commodity component of its rates. Pipelines such as Columbia that purchased gas from Texas Eastern allocated the resulting increased purchased gas costs to the commodity component of their rates. We conclude that the escrow payments made by Gulf represent a refund of excessive purchased gas costs and as such are commodity costs. We further conclude that interest earned on such payments are of the same character as the payments. Thus, the interest refunds at issue are "commodity refunds" within the meaning of the settlement.
 
 
 21
 Columbia Gas Transmission Corp. & Chevron U.S.A. Inc., Nos. TA82-1-21-001 & CI64-26-023, Order Authorizing Retention of Refunds at 5; App. at 152. The Commission also concluded that the refunds were applicable to a period prior to April 1, 1985.[5] The Commission rejected Washington's argument that allowing Columbia's retention of the refunds would be inequitable, or that retention was required so that consumers would "receive the protection intended":
 
 
 22
 These arguments are irrelevant. As Columbia correctly observes, its settlement involved mutual compromises and was approved by the Commission as reasonable and in the public interest. There is no basis whatsoever to disregard the specific terms of the settlement. The issue to be resolved is therefore a narrow one, namely, does the settlement permit Columbia to retain these refunds? We find that the settlement by its specific and unambiguous terms permits Columbia to retain these refunds.
 
 
 23
 Order at 6; App. at 152-53.
 
 
 24
 In denying Washington's subsequent motion for rehearing, the Commission again responded to Washington's reiterated assertion that the Commission had ignored the public interest in its order:
 
 
 25
 The Commission considered the public interest in approving the Columbia settlement. The settlement provided that Columbia's customers would receive a rate reduction and moratorium worth approximately $628 million over a two year period, as well as transportation and daily entitlement concessions. Furthermore, any commodity refunds received would be used to reduce possible future unrecovered gas costs that Columbia is authorized to recover from its customers over a seven-year period, starting September 1, 1987. The Commission concluded that Columbia's settlement was fair and reasonable and in the public interest. It is also in the public interest to carry out the terms of a binding agreement--the Columbia settlement. The Commission cannot upset the integrity of a settlement merely because a provision operates more favorably for one party than another.
 
 
 26
 Columbia Gas Transmission Corp. & Chevron U.S.A. Inc., Nos. TA82-1-21-027 & CI64-26-028, Order Denying Rehearing at 3 (Oct. 7, 1988); App. at 163. The Commission then concluded that Urban League had had constructive notice of the Columbia proceedings, and that the consumers represented by Urban League could therefore be "bound" to the terms of that settlement consistent with due process.
 
 
 27
 At the outset, we note that we are not being asked to review the merits of the Columbia settlement, which is presently the subject of proceedings before the FERC and the United States Court of Appeals for the District of Columbia Circuit. Process Gas Consumers Group v. FERC, No. 87-1620. We consider only the propriety of the Commission's decision to rely on the Columbia settlement as determinative of the disposition of the Gulf refunds.
 
 II.
 
 28
 We first address the challenge to the Commission's interpretation of the terms "commodity" and "refunds" as used in the Columbia settlement agreement. We generally defer to an agency's interpretation of agreements within the scope of the agency's expertise, see Western Union Tel. Co. v. FCC, 541 F.2d 346, 351 (3d Cir.1976), and the case for deference is particularly strong when the agency has interpreted regulatory terms regarding which it must often apply its expertise. See MCI Telecommunications Corp. v. FCC, 822 F.2d 80, 84-85 (D.C.Cir.1987). Accordingly, we will not upset the Commission's interpretation unless it is an unreasonable one. New York State Elec. & Gas Corp. v. FERC, 875 F.2d 43, 45 (3d Cir.1989).
 
 A.
 
 29
 Urban League argues that "[a] refund is the return of money previously paid," Br. of Petitioner at 17 (emphasis in original), in the sense that the money must be returned to a party that originally gave that money to the returning party. Although this is certainly one possible meaning of the word, we cannot upset the Commission's interpretation unless it is an irrational one. We reject Urban League's suggestion that the word "refund" can only mean "the return of money previously paid" in the sense noted.
 
 
 30
 In the Gulf proceedings, the parties, the Commission, and this court have all repeatedly and consistently referred to the amounts owed by Gulf as "refunds," notwithstanding the fact that the amounts were not actually incurred because of overcharges on Gulf's part, and thus were not literally meant as compensation for amounts taken by Gulf from Texas Eastern. This understanding of the word is reasonable because in a sense the refunds at issue here do indeed serve as the "return of money previously paid." Texas Eastern paid that money--not to Gulf, but to other suppliers to whom Texas Eastern had to turn because of Gulf's breach. Gulf, as the party found responsible for Texas Eastern's higher payments, was required by the Commission to "return" those funds to Texas Eastern. The fact that the party receiving the "refund" never actually overpaid the amounts in the refunds to the refunding party should not preclude the use of the word "refund" to describe the transaction. See Texas Eastern Transmission Corp. v. FPC, 414 F.2d 344, 348 (5th Cir.1969).
 
 
 31
 Finally, Baltimore argues that the payments of interest at issue here cannot represent "refunds" because they represent the time value of money. We think, on the contrary, that adjusting the payment of the refunds so that the recipient receives payment in inflation-adjusted dollars is a way of ensuring that the recipient is in fact "refunded." Since the point of the refunds in the first instance is making the recipients whole, and since that does not occur if the amounts are not adjusted for inflation, we think the Commission did not err in concluding that the interest funds should be considered an aspect of the refunds themselves. Cf. 18 C.F.R. Sec. 154.38(d)(4) (1988) ("If a pipeline does not elect to recover its gas costs under the PGA filing procedures ..., the jurisdictional portion of supplier refunds (including interest received )...."). Moreover, it was reasonable for the Commission to conclude that the interest was "of the same character as the payments," since it would make little sense for Columbia, the Commission, and the other parties to allow litigation and other delays to depreciate the value of the amounts Columbia would be allowed to retain. Accordingly, we find a reasonable interpretation of the word "refund" in this context to encompass the meaning put forward by the Commission.
 
 B.
 
 32
 Article II of the Columbia settlement provided that Columbia could retain certain "commodity" refunds but that it had to flow through "demand" refunds. Urban League and Baltimore argue that the refunds at issue here were "demand" refunds; Columbia and the Commission argue the opposite.
 
 
 33
 Most pipelines' rates filed under the Natural Gas Act are divided into two charges: demand and commodity. In theory, the demand charge represents estimates of costs associated with a customer's "demand"--the maximum amount he may demand from his supplier during a given time period. These are costs that must be incurred by virtue of the fact that the customer's supplier must be prepared for the maximum capacity the customer is contractually entitled to demand, regardless of what amount of gas the customer in fact eventually takes. The commodity charge, in theory, represents those variable costs associated with the actual delivery of a quantity of gas.
 
 
 34
 The terms "commodity charge" and "demand charge" are terms of art in the industry, however, and reflect not only this general theoretical distinction but also Commission and industry practice over the years. Traditionally, the Commission has followed a formula set out in Atlantic Seaboard Corp., 11 F.P.C. 43 (1952), that assigns some fixed, or "demand"-related costs to the commodity component of a rate. See Consolidated Gas Supply Corp. v. FPC, 520 F.2d 1176, 1180 (D.C.Cir.1975).[6] See also 18 C.F.R. Sec. 154.305(b)(3) (1988).
 
 
 35
 Having concluded that the Gulf refunds were "refunds" within the meaning of the Columbia settlement agreement, the Commission had to classify them either as "commodity refunds," in which event they would be retained by Columbia, or as "demand refunds," in which event they would be flowed through. It chose the former alternative because these refunds were intended to reimburse Texas Eastern and downstream entities for amounts paid for replacement gas in excess of the amounts that would have been paid if Gulf had been able to deliver the amounts requested of it, and because at the time of these overpayments, the parties involved, including those who would ultimately sign the Columbia settlement agreement, treated them as commodity costs. As the Commission noted and neither Urban League nor Baltimore disputes, Texas Eastern, when Gulf's default required it to purchase gas priced above the Gulf contract rate, allocated the excess purchased gas costs to the commodity component of the rates it charged Columbia and its other customers. Similarly, Columbia and the other pipelines that purchased gas from Texas Eastern allocated the resulting increased purchase gas costs to the commodity components of the rates they charged their customers. Given this contemporaneous treatment of the overpayments, necessarily with Commission approval, and the absence of any record evidence cutting in favor of an allocation of the Gulf refunds to "demand refunds," we cannot say that the Commission's finding with respect to the intention of the parties to the settlement agreement was unreasonable.
 
 
 36
 Baltimore argues that the Gulf refunds should be considered demand related because a demand charge is based on the maximum volume of gas a customer is entitled to and the amounts here "relate" to the amounts Texas Eastern was entitled to purchase from Gulf. We disagree.
 
 
 37
 The refunds are a measure of the damages incurred by Texas Eastern because of Gulf's breach. The amount, if any, of Texas Eastern's damages depended on two variables: (1) the extent to which Texas Eastern actually requested a quantity of gas from Gulf that Gulf was unable to sell it; and (2) the degree to which, if any, the market price was higher than the contract price. Gulf I, 563 F.2d at 603. The first variable is not related to demand costs because it reflects the amounts Texas Eastern actually requested of Gulf, not the amount which Texas Eastern was entitled to demand. It therefore is more closely related to a commodity charge, since it does not concern costs incurred as a result of maintaining a certain capacity to ensure the contractual performance.
 
 
 38
 The second variable could conceivably be considered demand related if the higher rate paid by Texas Eastern in the marketplace was due to demand charges higher than that of the contract price. Baltimore, however, does not argue that such was the case, and, even if it had, the record does not support such a conclusion.
 
 
 39
 Urban League's challenge to the Commission's finding is also unavailing. Urban League does not dispute that, to the extent Texas Eastern passed along its higher costs because of the Gulf breach, it passed them on in the commodity component of its rate. Instead, Urban League argues that higher commodity prices were not the only form of injury experienced by downstream utilities as a result of Gulf's default. It notes that curtailment of service was an alternative to the purchase of higher priced gas and that such curtailments would force "some users to consume alternate fuel, or to shut down, or to undertake conservative measures, or some combination of the foregoing." Reply Br. of Petitioner at 12. While this may be true, we fail to perceive how this possibility would tend to support a finding that the refunds were "demand refunds" within the meaning of the Columbia settlement agreement or why it undercuts the basis for the Commission's finding with respect to the intent of the parties to that agreement.
 
 III.
 
 40
 The principal argument of Urban League and Baltimore is that even if the Columbia settlement agreement is properly construed to authorize retention of the Gulf refunds by Columbia, the Commission acted arbitrarily, capriciously, and indeed unconstitutionally in failing to override that agreement with an order requiring a flow-through by Columbia. In support of this argument, three points are made: (1) The Commission had determined earlier in the Gulf proceeding that there should be a flow-through all the way to the ultimate consumer and its abandonment of that position, at least without an adequate explanation, was arbitrary and capricious. (2) Since the ultimate consumers participated in the loss occasioned by the Gulf default, fundamental fairness required that they receive the benefit of the refund and it was irrational to conclude otherwise. (3) Giving effect to the Columbia settlement agreement as the Commission did violated Urban League's constitutional right to procedural due process.
 
 A.
 
 41
 On July 16, 1986, the Commission rejected Urban League's arguments that it should mandate flow-throughs to the ultimate consumers, finding that as "a general matter, pipelines [should] flow through these refunds to their customers consistent with the PGA and/or refund provisions of their respective FERC gas tariffs." In other words, the Commission simply declined to preempt arrangements previously formulated by industry participants and approved by the Commission. Whether or not we would find this choice arbitrary even if the record in the earlier Gulf proceedings reflected a contrary conclusion, we find that record entirely consistent with the July 16, 1986 decision and will not disturb the Commission's choice.
 
 
 42
 For this argument to succeed, Baltimore and Urban League would have to point to something in the earlier Gulf orders indicating an intention on the Commission's part to flow through the refunds to the gas's ultimate consumers regardless of the tariffs and other rate rulings concerning entities downstream from Texas Eastern. That is, we would expect some indication that the Commission intended to foreclose subsequent enforcement of tariffs or purchased gas adjustment clauses for Texas Eastern's customers that take into account the expected receipt of refunds, perhaps weighing that expected receipt against an immediate lower rate to consumers. Moreover, we would expect to find some indication that the cost of Gulf's breach was originally borne entirely by the ultimate consumers rather than in part by the shareholders of the entities along the distribution chain. For if consumers were not the only ones who "paid" for that breach, it follows that they are not necessarily entitled to a full share of the compensation for Gulf's breach. See Ozark Gas Transmission System, 43 FERC p 61,122, No. IN86-6-002, Order Granting and Denying Requests for Rehearing, Denying Motion for Late Intervention, and Clarifying Order (April 27, 1988) (acknowledging that in cases where refunds are traceable to specific rates, flow through to consumers is inappropriate if intermediary, rather than consumers, absorbed the higher cost of the gas); Northern Natural Gas Co. v. F.P.C., 245 F.2d 447, 450 (8th Cir.1957) (distributors required to flow through refunds only to extent consumer paid). We have searched the Gulf record in vain for some indication that the Commission had decided against leaving the disposition of the refunds to other rate arrangements or that the Commission had considered that a total flow-through was the only fair resolution of the matter.
 
 
 43
 Baltimore and Urban League first call our attention to what they refer to as the "consumer oriented," Br. of Intervenor Baltimore at 10, or "consumer protective," Br. of Petitioner at 15, purpose of the Gulf remedy. We find these broad generalizations unconvincing. We need not question whether the intent of the Gulf remedy was indeed largely to benefit consumers. Assuming that such was the case, we do not think it follows that the Commission intended to deprive itself of the authority to structure the distribution of the refunds in ways other than direct flow-throughs to consumers. Indeed, we find substantial language in the Commission's orders implicitly indicating a rejection of that option.
 
 
 44
 Even Baltimore's brief cites language that suggests the Commission did not necessarily consider disposition of the refunds to be exclusively for the benefit of consumers. The Commission repeatedly referred to compensation for the "customers" of Texas Eastern, and to the purpose of the refund remedy as "making the injured parties whole." Gulf Oil Corp., No. CI64-25, Order Denying Rehearing and Directing Refunds, 17 FERC p 61,264 at 61,519 (Dec. 18, 1981) (emphasis added). The June 6, 1986 order, also one quoted by Baltimore, notes the purpose of the refunds as being to "place all parties in the same position they would have been in had the disallowed force majeure volumes been treated as underdeliveries at the time they occurred." Gulf Oil Corp., No. CI64-26-014, Order Revising Refund Plan in Part, Directing Payment of Refunds and Scheduling Conference at 4-5 (June 6, 1986); app. at 4-5 (emphasis added).
 
 
 45
 Baltimore cites the following language from a 1976 order of the Commission in the Gulf proceedings as evincing the Commission's intent to flow through the refunds exclusively to consumers:
 
 
 46
 In the Commission's opinion fairness to the consumers demands that where Gulf has defaulted on its undertaking to supply gas at a given price, Gulf should make payments in order to leave Texas Eastern and the consumers in approximately the same economic position they would have been if they received the gas.
 
 
 47
 Gulf Oil Corp. and Texas Eastern Transmission Corp., No. CI64-26, 56 FPC 2293, 2300 (Oct. 15, 1976). But Baltimore ignores the fact that, at the same page, the Commission also said, "The refund is designed to compensate Texas Eastern and its customers for Gulf's failure to make full deliveries in the past." Id. (emphasis added).
 
 
 48
 Other discussion in the October 15 order shows that the Commission considered requiring Texas Eastern's customers to flow through the refunds but rejected it. The Commission noted that Urban League had requested such action: "[Urban League] argues that the Commission should exercise its authority to require refunds that will flow through to the consumers injured by the prior certificate violations." 56 FERC at 2300. The Commission then directed Texas Eastern to flow through to its customers, but said nothing about what those customers would be required to do.
 
 
 49
 Urban League and Baltimore also call our attention to the general consumer-oriented purpose of the Natural Gas Act. What they fail to explain is why such a purpose requires flow-through to consumers in this case, unless a consumer-oriented purpose requires a flow-through of refunds to consumers in every case. Saying that the National Gas Act was intended to benefit consumers simply does not answer the question of how refunds ought to be dealt with. Surely one way for the Commission to deal with them is to leave decisions for the apportionment of such funds to the individual PGA's and tariffs of downstream entities. Citing the general consumer-oriented purpose of the Act fails to explain why, in this case, such a decision is inappropriate.
 
 
 50
 In sum, there is simply nothing in the Commission's prior orders that indicates it believed the Gulf refunds had to be flowed through to the ultimate consumers. Rather, the orders suggest that the Commission considered the idea of flow-throughs, and declined to require them further than from Texas Eastern to its customers. Moreover, nothing argued by Baltimore or Urban League convinces us that the purpose of the Gulf remedy is frustrated if flow-throughs to the ultimate consumers are not required or that the enforcement of downstream PGA's and tariffs will result in the consumers' receiving less than their fair share of economic benefit.
 
 B.
 
 51
 This brings us to the fundamental fairness argument. The Commission recognized that the ultimate consumers had suffered injury as a result of Gulf's default and that they well might be entitled to a share of the refunds were it not for the Columbia settlement agreement. The fact remained, however, that there was a settlement agreement, one that gave to Columbia's customers a rate reduction and moratorium valued at $628 million, a setoff against possible future recovery by Columbia of unrecovered gas costs, and other concessions. The Commission had earlier approved the "mutual compromises" of the settlement agreement "as reasonable and in the public interest," App. at 152-3. It found that there was thus no unfairness in enforcing the settlement agreement and that, indeed, the public interest was furthered by its doing so. We conclude that this analysis provided a satisfactory basis for the Commission's rejection of the fundamental fairness argument.
 
 C.
 
 52
 Finally, Urban League challenges the propriety of the Commission's reliance on the Columbia settlement on due process grounds. Urban League argues that, "as a matter of due process, [the Gulf remedy matter] could not have been resolved in the Columbia case since no notice was ever given that it would be considered in that docket." While appearing to concede that it was aware of the Columbia settlement proceedings, Urban League then proceeds to argue that its awareness would have been irrelevant because the Commission's order with regard to that settlement "never mentioned Gulf." Br. of Petitioner at 20. Accordingly, Urban League urges, it never received "notice that Columbia was claiming, or the Commission was authorizing, Columbia's retention of Gulf-remedy payments which were being quantified in another proceeding." Id.
 
 
 53
 Urban League's theory appears to be that the due process clause required the Commission in the Columbia proceeding not only to give notice regarding its proceedings, but to give notice regarding the exact effect of language that might be adopted in those proceedings. Urban League then appears to conclude that, to the extent the Commission approved language in such a proceeding that is construed in the Gulf proceeding as determining the disposition of the refunds, the Commission's reliance offends due process.
 
 
 54
 We find Urban League's argument untenable. It had notice of the Columbia proceedings, and the proposed settlement in that proceeding contained a provision specifically addressing the possibility that Columbia would receive refunds attributable to the period before April 1, 1985, and allocating the economic value of those refunds among Columbia and its customers. As we have held, that language can reasonably be interpreted to provide for the allocation the Commission has made. Urban League had an opportunity to appear in the Columbia proceeding and ask the Commission not to approve a settlement agreement that could be so construed. It was not denied due process.
 
 IV.
 
 55
 The petition for review will be denied.
 
 
 
 [1]
 Urban League states that its members "are served by Washington Gas Light Company, a local distribution company which historically has purchased the major portion of its gas supply from Columbia Gas Transmission." Br. of Petitioner at 19 n. 11
 
 
 [2]
 Gulf's successor is Chevron U.S.A. Inc
 
 
 [3]
 The lower rate was based on a 100% annual load factor (that is, purchase of the maximum amount of gas to which Texas Eastern was entitled) and the higher rate on an 80% annual load factor. Gulf Oil Corp. & Texas Eastern Transmission Corp., 56 F.P.C. 2293, No. CI64-26 (Oct. 15, 1976). See also Gulf Oil Corp. v. F.P.C., 563 F.2d 588 (3d Cir.1977)
 
 
 [4]
 Purchased gas adjustment clauses are used by pipelines to recover changes in the costs of purchased natural gas while bypassing the more complex and costly procedures involved in a general rate proceeding under section 4 of the Natural Gas Act. See 18 C.F.R. Sec. 154.301 et seq. (1988)
 
 
 [5]
 Baltimore and Urban League do not dispute this finding on appeal
 
 
 [6]
 The Seaboard formula was also employed in the rates set by the Columbia settlement. See Columbia Gas Transmission Corp., Stipulation & Agreement at 10; Br. of Respondent at C-13