People of the State of NEW YORK, by Eliot SPITZER Attorney General of the State of New York, Buffalo Gyn Womenservices, Shalom Press, M.D., Planned Parenthood, of the Rochester/Syracuse Region, Pro–Choice Network, of Western New York and Morris Wortman, M.D., Plaintiffs–Counter–Defendants–Appellees,

v.

OPERATION RESCUE NATIONAL, Lambs of Christ, Christian American Family Life Association, Philip Benham, a/k/a "Flip", Norman Weslin, Norman Crawford, Richard Armenia, Mary Arno, John Blanchard, Paul Arno, John Barron, Albert Boettcher, Eva Boldt, Martin Chaberlain, Ken Delozier, Amy Dorscheid, Robert Dorscheid, Daniel Drury, Darren Drzymala, Alan Fricke, Amy Fricke, James Govola, Mary Sue Govola, Kenneth Harms, Michael Iluzzi, Karen Jackson, Eric Johns, Bernice Kleinhammer, Paul Koehn, Richard Krulewicz, Daniel Lamantain–Leatherman, Rosina Lotempio, Edmund Lutz, Dennis Marriott, Dennis Marriott, David Martin, Arnold Matheson, Michael McBride, William Michael, James Missall, Michael Mombrea, Dwight Monagan, Jacob Meuller, Sharon Murphy, Linda Palm, Hettie Pascoe, Robert Pokalsky, Dan Przywuski, Robert Raco, Jacqueline Rademacher, Rene Riddle, W. Randolph Smith, William Smith, Sherrie Sterlace, Roseanne Sutter, Gerald Sutter, John Urgo, John Vandeven, Mickey Vandeven, Nancy Walker, Phyllis Walker, Calvin Zastrow, John and Jane Does, the last two named being fictitious names, the real names of such persons being currently unknown but who are active in defendant organizations or act in concert with the above named individuals to engage in, or who will engage in, the conduct complained of herein, Defendants–Counter–Defendants,

Rescue Rochester, Mary Beth Powley, Last Call Ministries, Bob Behn, Bonnie Behn and Gerald Crawford, Defendants–Counter–Claimants,

Michael Warren and Mary Melfi, Defendants–Counter–Claimants–Appellants.

Docket Nos. 00–9076(L), 00–9188(Con).

United States Court of Appeals, Second Circuit.

Argued March 26, 2001.

Decided Nov. 26, 2001.

See also, 69 F.Supp.2d 408.

188

Vincent P. McCarthy, American Center for Law and Justice Northeast, Inc., New Milford, CT, for Appellant Michael Warren.

Christopher A. Ferrara, American Catholic Lawyers Association, Inc., Ramsey, NJ, for Appellant Mary Melfi.

Jennifer K. Brown, Assistant Attorney General, New York, NY, (Eliot Spitzer, Attorney General of New York, of counsel), for Appellee People of the State of New York.

Lucinda M. Finley, State University of New York at Buffalo, Buffalo, NY, for Appellees Buffalo GYN Womenservices, Inc., Shalom Press, M.D., Planned Parenthood of the Rochester/Syracuse Region, Pro–Choice Network of Western New York, and Morris Wortman, M.D.

Before: McLAUGHLIN, F.I. PARKER, and STRAUB, Circuit Judges.

STRAUB, Circuit Judge.

Defendants–Appellants Mary Melfi and Rev. Michael Warren appeal from a preliminary injunction entered in the United States District Court for the Western District of New York (Richard J. Arcara, *Judge* ) which, *inter alia,* imposes no-protest "buffer zones" at a broad range of health care facilities that offer reproductive health services in the Western District of New York, provides for expanded zones at two particular clinics in the Western District of New York, modifies the zones to eliminate exceptions for "sidewalk counselors," and prohibits the use of sound amplification systems at protests near all covered facilities. The plaintiffs charged Melfi and Warren with violating the Freedom of Access to Clinic Entrances Act, as well as state laws prohibiting trespass and public nuisance. Melfi and Warren, the only defendants pursuing this appeal, are pro-life activists who claim that they have not violated any of those laws and that even if they had, the injunction violates their First Amendment rights to free speech.

Regarding liability, we hold that Melfi's conduct likely constituted a violation of F.A.C.E., and justified preliminary injunctive relief against her. The record against Warren, however, is considerably weaker. We vacate the injunction against him, but remand for additional proceedings concerning Warren's actions in violation of an earlier temporary restraining order. Turning to the constitutionality of the injunction against Melfi, we hold that the provision of the injunction that expands the buffer zones beyond fifteen feet at two clinics is unconstitutional, but we otherwise uphold the buffer zone provisions, including the elimination of the "sidewalk-counselor" exception and some other slight modifications. We vacate the provision that bans Melfi from using sound amplification

equipment at protests near covered health facilities and remand for additional findings and refinement.

## BACKGROUND

Plaintiffs–Appellees include the State of New York, Drs. Shalom Press and Morris Wortman, and reproductive health facilities Buffalo Gyn Womenservices ("BGW") and Planned Parenthood of the Rochester/Syracuse Region ("PPR"). Together, they seek injunctive relief regulating the conduct of protests outside of reproductive health facilities in the Western District of New York. Defendants Melfi and Warren, active pro-life protestors, appeal from the District Court Order granting a preliminary injunction on the grounds that (1) they have violated no law justifying injunctive relief and (2) the injunction infringes their First Amendment free speech rights.

The Western District of New York has been the site of ongoing anti-abortion protests going back at least a decade. On February 14, 1992, the District Court issued an injunction ("1992 Injunction") that set the legal and factual background of the current case, and familiarity with the related decisions is assumed.[1] *Pro–Choice Network of Western New York v. Project Rescue Western New York,* 799 F.Supp. 1417 (W.D.N.Y.1992), *aff'd in part & rev'd in part,* 67 F.3d 359 (2d Cir.1994), *aff'd in banc,* 67 F.3d 377 (2d Cir.1995), *aff'd in part and rev'd in part sub nom. Schenck v. Pro–Choice Network of Western New York,* 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997). The salient provision of the earlier injunction established a fifteen-foot buffer zone outside the entrances and driveways of facilities that perform abortions in the Western District of New York. The 1992 Injunction included a "sidewalk-

counselor" exception that permitted two protestors to enter the buffer zones and approach patients entering or leaving the facilities for the purpose of "sidewalk counseling consisting of conversation of a non-threatening nature." The District Court issued the 1992 Injunction in anticipation of the perceived threat of mass disturbances at abortion facilities resulting from the "Spring of Life" protest, a planned mass demonstration scheduled for April of that year.

Between the issuance of the 1992 Injunction and the initiation of this action, protest activities at reproductive health facilities in the Western District of New York continued on a regular basis, but with less intensity. In October 1998, those activities promised to take a serious turn: members of the pro-life protest movement, including some of the defendants in this action, announced "Operation Save America"—a large scale protest in Buffalo and Rochester planned for April 18–25, 1999, and purportedly modeled after the 1992 "Spring of Life" protests. In anticipation of the planned protest, the plaintiffs brought this action on March 22, 1999, seeking a temporary restraining order and a preliminary injunction. The plaintiffs asserted violations of the Freedom of Access to Clinic Entrances Act of 1994 ("F.A.C.E."), 18 U.S.C. § 248, and state law claims of nuisance and trespass.

On April 15, 1999, after a four-day hearing, the District Court granted a temporary restraining order ("T.R.O.") to protect access to reproductive health care facilities. The planned protests occurred, the T.R.O. was enforced, and the plaintiffs' facilities were not disrupted. Unlike the 1992 "Spring of Life" demonstration, which involved thousands of protestors

---

1. Although Melfi and Warren were not defendants in this earlier action, the two suits share

many of the same parties, issues, and fact patterns.

and widespread clinic blockades, "Operation Save America" drew only about one hundred protestors and, apparently, no blockades.

The plaintiffs subsequently sought to convert the T.R.O. into a preliminary injunction. During an extensive twenty-three-day hearing, the District Court received evidence which it described as, for the most part, "uncontested" and "overwhelming." The District Court found that the defendants repeatedly interfered with access to reproductive health facilities in violation of F.A.C.E. and also created significant public safety hazards amounting to a public nuisance and trespass pursuant to New York law.

The District Court determined that the protestors likely violated F.A.C.E. by threatening violence, engaging in minor acts of violence, and imposing a "constructive obstruction" that amounted to physical obstruction. The threats included directed warnings of impending death and violence. The protestors physically obstructed clinic entrances by "crowding" patients and their escorts as they enter and exit clinics and by walking very slowly in front of driveways. The crowding sometimes caused approaching individuals and protestors to "touch." On several occasions this behavior resulted in pushing matches as parties engaged in heated exchanges. Protestors similarly approached and distracted oncoming cars in aggressive ways which created traffic hazards. They walked slowly in front of oncoming cars to delay them, on one occasion blocking a clinic employee for thirty seconds until she "gave up" trying to leave the clinic. The protestors were often noisy, shouting at close range and using bullhorns to increase the volume of their protests.

The District Court further held that these same protest activities likely constituted a public nuisance and trespass by interfering with the delivery of medical care at subject clinics. The clinics' ability to provide medical services was hampered by the atmosphere created by the protests. Patients arrived at clinics with increased blood pressure, stress, and anxiety levels. Patients had to pass through the protestors and, in some cases, could continue to hear them from inside the clinic.

The District Court thus issued a preliminary injunction ("2000 Injunction"). The 2000 Injunction applies many of the same provisions as the 1992 Injunction to a new group of defendants, but with important differences. Like the 1992 Injunction, it prohibits the defendants from "demonstrating, congregating, standing, sitting, or lying on, or posting or carrying signs, or being present within fifteen feet of either edge of any doorway, walkway, or driveway entrance" to any covered facility. In several respects, the new injunction is more stringent: it applies the buffer zone to all reproductive health facilities in the Western District of New York, not just those providing abortions; it enlarges the buffer zones at two facilities-Planned Parenthood Rochester and Buffalo Gyn Womenservices; it eliminates the exception which permitted two sidewalk counselors to enter the buffer zone; and it bans the use of sound amplification equipment at protests throughout the Western District. The District Court concluded that the injunction would leave adequate alternative avenues of communication open to the protestors.

This timely appeal followed.

## DISCUSSION

In assessing the appellants' challenge to the 2000 Injunction, we must determine whether the District Court was justified in granting the injunction and whether the precise terms of the injunc-

tion are constitutional. As to the first issue, injunctive relief is available upon a showing by the plaintiffs that they are likely to prevail on the merits of their suit and that if injunctive relief is not granted, irreparable injury will result. *See, e.g., Charette v. Town of Oyster Bay,* 159 F.3d 749, 754 (2d Cir.1998). The appellants do not dispute the District Court's findings of irreparable injury, but instead contend that they did not violate F.A.C.E. or the laws which underpin the pendent state causes of action. They also claim that even if they had violated those laws, the 2000 Injunction unconstitutionally restricts their First Amendment rights. Thus, the first part of our discussion reviews the District Court's determination that the plaintiffs are likely to establish that defendants Melfi and Warren violated F.A.C.E. or the state laws prohibiting public nuisance and trespass. The second part of the discussion employs well-established First Amendment principles to assess the validity of the terms of the injunction.

■■■ We review a district court's issuance of a preliminary injunction for abuse of discretion. *See Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 167 (2d Cir.2001). A district court commits an abuse of discretion when "it base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). In cases raising First Amendment issues, however, "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 284–

286, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948) (emphasis omitted)). The appellate court must also be vigilant for errors of law that "may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Id.* at 501, 104 S.Ct. 1949.

### I. AVAILABILITY OF INJUNCTIVE RELIEF

#### A. Mary Melfi

■■ We begin by reviewing the District Court's finding that Mary Melfi likely violated F.A.C.E., and that the plaintiffs are therefore entitled to injunctive relief against her. For the reasons set forth we agree that injunctive relief is warranted.

The Freedom of Access to Clinic Entrances Act provides civil remedies and criminal penalties against anyone who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services...." 18 U.S.C. § 248(a)(1). The statute defines "physical obstruction" as "rendering impassable ingress to or egress from a facility that provides reproductive health services ... or rendering passage to or from such a facility ... unreasonably difficult or hazardous." *Id.* § 248(e)(4).

■■ F.A.C.E. empowers states to bring civil suits seeking remedies based upon the

threat of future violation, even without proof of past violations. "If the Attorney General of a State has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, such Attorney General may commence a civil action in the name of such State...." *Id.* § 248(c)(3)(A). Such remedies may include "temporary, preliminary or permanent injunctive relief, compensatory damages, and civil penalties...." *Id.* § 248(c)(3)(B).

On appeal, defendant Melfi does not dispute the District Court's determination that her behavior was intentional or motivated by the fact that the clinics provide reproductive health services. Instead, she contends that her protest activities do not constitute acts of force, threats of force, or physical obstruction.

As a general matter, the District Court determined that the plaintiffs are likely to prove that certain protestor activities violated F.A.C.E. by disrupting access to and the administration of care at reproductive health care facilities through physical obstruction and threats of force.[2] The record on that point appears strong. In terms of physical obstruction, the record contains evidence that some of the defendants impeded the operation of those facilities by engaging in protest activities in front of facility entrances and driveways. Protestors often walked across driveways so as to meet oncoming cars, and then deliberately attempted to slow or even stop the cars' progress. Although the protestors' purpose may have been to communicate their views, their activities had the effect of obstructing access to the facilities and making egress and ingress unreasonably difficult for patients. The record shows that some of the defendants have also interfered with pedestrians as they approach the building, shouting at them and standing in front of them as the pedestrians tried to enter the building. When allowed close to facility entrances, the protestors have sometimes blocked clinic doors by standing directly in front of them and trying to communicate with those entering or leaving facility buildings. This behavior was apparently so extensive that it rendered building access unreasonably difficult. In addition to this evidence showing that protestor activity often obstructed access to clinics, there were also isolated instances of defendants threatening clinic workers, including one defendant who told clinic employees that they would die before the day ended.

General findings like this, however, are of limited utility with respect to Melfi. The validity of the District Court's injunction against Melfi turns on the findings made with regard to her in particular. Having reviewed those findings, we conclude that the plaintiffs are likely to succeed on the merits of their F.A.C.E. claim against her, and therefore injunctive relief is warranted.[3] Melfi has participated in many of the disruptive protests discussed

2. The District Court also found that the defendants had engaged in acts of force. In light of the evidence concerning physical obstruction, however, we need not reach the issue of whether the plaintiffs are likely to prove that acts of force were committed.

3. For these purposes, it is very important to stress that our determination regarding the likelihood of meeting the plaintiff's burden in this civil case should not be taken to mean that this evidence would meet the more stringent burden required to prove a criminal charge against Melfi. *Compare United States v. Scott,* 958 F.Supp. 761, 777 (D.Conn.1997) (providing injunctive relief where plaintiffs in a civil case prove a violation of F.A.C.E. by a preponderance of the evidence) *with United States v. Wilson,* 2 F.Supp.2d 1170, 1171 (E.D.Wis.1998) (requiring the state to prove a criminal violation of F.A.C.E. beyond a reasonable doubt).

above, and much of the general evidence is supplemented by specific evidence about Melfi's protest conduct. The District Court found that Melfi participated in the types of protest behavior outside of clinic entrances that will likely be shown to have physically obstructed clinic entrances. The record is replete with consistently egregious conduct by Melfi in this regard. She frequently protests at PPR, where she has obstructed driveway access, using her body to slow moving cars and pushing literature and pamphlets through car windows. Her activities have required police intervention on several occasions. One tactic she employs to slow access to the PPR parking lot involves dropping an item on the ground and then retrieving it in slow motion. She often confronts patients at close range, shouting at them through a bullhorn, and has even blocked patients inside their automobiles by standing up close to the car doors. At least at this preliminary stage of the litigation, we conclude it is likely that the plaintiffs will carry their burden in demonstrating that Melfi physically obstructed patient access to covered facilities in violation of F.A.C.E.

■■■■■ In reviewing the substantive legal basis for a typical injunction, we would leave the matter having concluded that the District Court's liability findings did not constitute an abuse of discretion. We remain mindful, however, of the fact that an erroneous application of F.A.C.E. threatens to impinge legitimate First Amendment activity. In fulfilling our duty to conduct an independent examination of the record as a whole, *see Bose*

*Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), we must note our conclusion that the evidence adduced at the preliminary injunction hearing was less overwhelming than the District Court suggested. At times, the District Court characterized legitimate protest activities as illegal interference with clinic access. Under the rubric of "constructive obstruction," an uncertain and potentially slippery concept, the District Court failed to differentiate illegal protestor activity from protected and typical, albeit aggressive, protest activities. The District Court grouped together defendants who "block driveways" with defendants who "approach" and "yell" at patients. Among the abusive behavior that the District Court enumerated as part of the "gauntlet of aggressive and frightening approaches," the District Court highlighted protest activity typically deserving of protection. This included those who protest "in an 'angry' tone," and one protestor's habit of shouting at arriving patients in a "loud deep voice." The District Court concluded, without explanation, that patients' reactions to this behavior was limited to the conduct, and not the message of the protestors.[4] As much as we might idealize the antiseptic, rational exchange of views, expressions of anger, outrage or indignation nonetheless play an indispensable role in the dynamic public exchange safeguarded by the First Amendment. The fact that such protests make approaching health facilities unpleasant and even emotionally difficult does not automatically

**4.** We do not mean to dismiss the District Court's holding that some protestor activity intimidated patients, and that such behavior damages patients' health and ability to obtain medical treatment. So long as it constitutes an act of force, threat of force or physical obstruction, such behavior can be enjoined pursuant to F.A.C.E. We simply caution that

district courts should carefully explain how such egregious behavior causes such devastating effects, and not simply characterize protestor behavior with discussion of emotionally upset patients. Our concern is that bans based on such general characterizations are likely to sweep up legitimate behavior.

mean that such protest activities may be curtailed. It is worth reinforcing that we must tolerate even views that upset our most heartfelt and deeply held convictions. "Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Wolin v. Port of N.Y. Auth.*, 392 F.2d 83, 91 n. 10 (2d Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968) (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)).

We are also troubled by the District Court's willingness to characterize a broad range of protestor statements as "threats" without giving them the full analysis required by the First Amendment. When determining whether a statement qualifies as a threat for First Amendment purposes, a district court must ask whether "the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution...." *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir.), *cert. denied*, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976). Although proof of the threat's effect on its recipient is relevant to this inquiry, *United States v. Malik*, 16 F.3d 45, 49 (2d Cir.), *cert. denied*, 513 U.S. 968, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994), a court must be sure that the recipient is fearful of the execution of the threat *by the speaker* (or the speaker's co-conspirators).

Thus, generally, a person who informs someone that he or she is in danger from a third party has not made a threat, even if the statement produces fear. This may be true even where a protestor tells the objects of protest that they are in danger and further indicates political support for the violent third parties. *See Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 244 F.3d 1007, 1015 (9th Cir.2001), *rehearing en banc granted*, 268 F.3d 908 (9th Cir. 2001). The evidence adduced at the hearing contains many such statements that do not constitute threats even though they may have increased the recipient's apprehension of harm. Yet the District Court did not pay due attention to this difference.

Although we are skeptical as to whether any of Melfi's statements constitute true threats, there is one in particular that illustrates our concern. The District Court found that Melfi threatened a clinic doctor when, soon after the murder of Dr. Bernard Slepian, she told the doctor that killing babies is no different than killing doctors.[5] Given the context, it is understandable that the clinic doctor feared for her safety, and that Melfi's protest and strong rhetoric reinforced that fear. But excessive reliance on the reaction of recipients would endanger First Amendment values, in large part by potentially misconstruing the ultimate source of the fear. Melfi's expression went to the core of her protest message, and the statement (even in context) did not suggest that Melfi was

---

**5.** Melfi made two other comments which the District Court construed as threats. On one occasion, she told a group of workers at PPR, "You won't be laughing when the bomb goes off." The clinic worker who testified to this statement, waited two weeks before reporting the comment to the police. Were it not for the fact that the recipient of this alleged threat reacted without apparent alarm, we

would be more likely to conclude that this statement constituted a true threat. On another occasion, Melfi told a clinic doctor, "You're next, I hope you're next, you're next." She made the comment shortly after the murder of Bernard Slepian, a New York doctor who performed abortions in the Western District.

engaged in a plan to harm the clinic doctor. This statement did not indicate the "unequivocal immediacy and express intention," *Kelner*, 534 F.2d at 1027, of a true threat.[6] It was not a direct or even veiled threat, but expression of a political opinion. As such, it is entitled to First Amendment protection.

Indeed, we are troubled that the District Court at times overstated the protestors' activities, often by characterizing legitimate First Amendment activity as criminal behavior. Despite these misgivings, however, we are satisfied that the District Court did not abuse its discretion when it determined that Melfi likely violated F.A.C.E. by physically obstructing patient and staff access at PPR. Since we agree with the District Court that the plaintiffs have shown a likelihood of success on the merits of their claim against defendant Melfi, we do not address the preliminary findings that Melfi may also have violated New York State public nuisance and trespass law.

**B. Michael Warren**

Michael Warren also disputes the District Court's findings that he likely violated—or threatened to violate—F.A.C.E., or that he violated New York State nuisance and trespass law. We conclude that the limited findings against him do not support the District Court's exercise of injunctive power. We thus vacate the injunction against Warren. The District Court, how-ever, chose not to consider some potentially crucial evidence that Warren violated the T.R.O. against him, and we therefore remand for further proceedings.

We will consider each of the substantive causes of action in turn.

**1. Freedom of Access to Clinic Entrances Act**

■ We find it difficult to fully understand the nature of the case against Warren pursuant to F.A.C.E., in large part because the District Court's Decision and Order contains few references to him. As explained above, F.A.C.E. provides for injunctive relief against persons who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services...." 18 U.S.C. § 248(a)(1). The Act further provides for injunctive relief where a person's future actions pose a threat to clinic access. *See id.* § 248(c)(3)(A).

It appears to us that the District Court found it likely that Warren's protest organizing efforts threatened to violate F.A.C.E. in the future. We reach this conclusion in part because there are no findings that Warren has committed any

---

**6.** For examples of statements found to be true threats, see, for example, *United States v. Sovie*, 122 F.3d 122, 124–25 (2d Cir.1997) (defendant made twenty-two calls over two days telling former girlfriend "[e]ither get on the bus in the mornin' or you're gonna find somebody dead up there in New York ... You're gonna be dead and in a fuckin' casket" and telling her son "I'm gonna fuckin' hurt you so motherfuckin' bad you're gonna wish you were dead"); *United States v. Malik,* 16 F.3d 45, 48 (2d Cir.) (defendant sent letter to court threatening "to deal with each of these defendants family and them physically upon his soon prison discharge" if his case was not processed), *cert. denied,* 513 U.S. 968, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994). *Kelner,* 534 F.2d at 1021 (defendant stated "we are planning to assassinate Mr. Arafat.... Everything is planned in detail.... If I elaborate it might be a problem in bringing it off."); *see also Am. Coalition of Life Activists,* 244 F.3d at 1016 n. 11 (collecting cases with true threats).

past violations of F.A.C.E. The only past actions by Warren considered by the District Court occurred before Congress enacted F.A.C.E. in 1994: namely, he participated in a number of "rescue missions," the last of which occurred immediately prior to F.A.C.E.'s effective date; he trespassed on the property of a non-party hospital where he passed out anti-abortion literature; and some of his activities have resulted in trespass convictions. The District Court *did* consider Warren's recent political activities. He currently holds leadership positions in Defendant Rescue Rochester and he helped organize "Operation Save America"—the planned protest which led to the imposition of the T.R.O. The plaintiffs contend that the District Court found that "Operation Save America" was modeled on the earlier, disruptive protest campaign,[7] and therefore that the District Court concluded that Warren was planning, and might again plan, to organize protest activities that threaten clinic access.

As we noted earlier, "Operation Save America" concluded *prior* to the entry of a preliminary injunction. Yet the District Court made no additional findings as to whether Warren continued to plan protests that might threaten clinic access. While we do not address the question of whether the record was sufficient to support injunc-

tive relief for the duration of "Operation Save America," it is clear to us that, once those protests had occurred without serious incident, the chief rationale behind enjoining Warren greatly weakened. Beyond the District Court's many references to activities by unnamed "defendants," we are left with only one specific set of facts: Warren interfered with clinic access before Congress had made it a criminal offense by enacting F.A.C.E. Such a limited factual record against Warren cannot support New York State's "reasonable cause to believe" that Warren's ongoing activities constitute a threat to clinic access as required for injunctive relief pursuant to F.A.C.E.[8]

■ Seeking to go beyond the District Court's factual findings, the plaintiffs have also charged that Warren violated the T.R.O. on several occasions prior to the issuance of the preliminary injunction, and that these violations might support the injunction against him. In its Decision and Order granting the preliminary injunction, the District Court referred to this evidence, but explicitly chose not to make findings of fact, reserving decision on those factual disputes for separate contempt proceedings. We agree with the plaintiffs that the particular factual context

---

**7.** We are not entirely certain how the District Court arrived at its conclusion—assuming it reached that conclusion at all—that Warren was planning "Operation Save America" as a reprise of the 1992 "Spring of Life" campaign. In the materials advertising "Operation Save America" that were submitted to us, only two items mentioned the "Spring of Life" protests. First, an Operation Rescue Director stated "When we brought the Gospel of Christ to the streets of this city during the 'Spring of Life' campaign in April 1992, there were six abortion mills.... Today there are only two abortion mills in operation in Buffalo, and we pray, by year's end, both will be history." Second, Rev. Cal Zastrow wrote "The 1992 'Spring of Life' in Buffalo ruined

my life." It is obvious that neither of these statements sheds much light on Warren's intentions as he planned "Operation Save America."

**8.** An injunction might have been warranted if the District Court had made particularized findings that Warren orchestrated, planned, or incited protests activities that violated F.A.C.E., even if undertaken by unnamed defendants. We conclude, however, that Warren's pre-F.A.C.E. activities, coupled with other defendants' post-F.A.C.E. activities, do not support an injunction against Warren based on F.A.C.E.

of these incidents may be critical to determining whether Warren has violated F.A.C.E. and, therefore, whether injunctive relief against him is appropriate. Depending upon the nature and circumstances of the T.R.O. violations, Warren's actions may have violated not only the T.R.O., but also impeded clinic access in violation of F.A.C.E.

 Subsequent to argument on this appeal, the District Court did make factual findings on the contempt charge, but those findings do not settle the question of whether Warren violated F.A.C.E. when he violated the T.R.O. On August 17, 2001, the District Court issued a Decision and Order ("the Contempt Decision"), finding that Warren violated 18 U.S.C. § 401(3) (contempt) by protesting within buffer zones at covered facilities. *See* Decision and Order Dated August 17, 2001, Misc. Cr. 00–029A. The appeal of the contempt proceeding is clearly not before us, but we may take judicial notice of the District Court's decision. Specifically, the District Court found that Warren violated the T.R.O. on three occasions. Concerning the first two violations on May 18 and May 22, 1999, the District Court only stated that Warren demonstrated against abortion while inside the buffer zone at Genessee Hospital, but gave no further detail. The District Court also found that Warren entered the Planned Parenthood Rochester buffer zone on July 14, 1999. The court did not specify where in the buffer zone Warren stood or what Warren did while standing there. Almost all of the specific findings by the District Court concerned another protestor named Gerald Crawford. In other words, the Contempt Decision never addressed the factual questions that, for our purposes, are essential: namely, whether Warren's actions in violation of the T.R.O. utilized "force or threat of force or ... physical obstruction" to

"intentionally injure[ ], intimidate[ ] or interfere[ ] with or attempt[ ] to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services...." 18 U.S.C. § 248(a)(1). Mere presence within a buffer zone is not enough for finding a F.A.C.E. violation. We also need to know what part of the zones Warren entered in violation of the T.R.O., whether patients were present during those incidents, or even, assuming patients were present, whether his actions blocked clinic access. Since the T.R.O. is in part a prophylactic designed to prohibit a range of behavior that has a strong tendency to interfere with clinic access, even a clear violation of its terms might not stand as an independent contravention of F.A.C.E.

Testimony at the preliminary injunction hearing concerning Warren's violations of the T.R.O. indicates that he may not have interfered with clinic access. For example, one alleged violation by Warren apparently involved his presence in buffer zones at Planned Parenthood Rochester. At the preliminary injunction hearing, a police officer testified that Warren was present in the PPR zone, and refused to leave despite repeated warnings. The police officer explicitly testified that Warren never blocked anyone entering or exiting the clinic and never threatened anyone. In other words, the officer's testimony describes behavior that might be a technical violation of the T.R.O. (justifying criminal contempt proceedings) but not illegal interference with clinic access (rendering F.A.C.E. inapplicable).

Our difficulty in assessing the case against Warren can thus be traced to at least three problems. First, the District Court failed to set forth clear findings

related to the different individuals named in the injunction. The District Court even issued the injunction against unidentified John Does.[9] In place of such particularized findings, the District Court issued findings that tended to discuss habitual behavior of a group of defendants without specifying who exactly was engaging in that behavior. The lack of particularized findings creates the genuine risk—a risk that may have been realized in Warren's case—that a person's political associations or participation in political protests will serve as the conduit for a finding of liability under F.A.C.E.

■ Second, the District Court did not definitively confirm that all named defendants are currently engaged in plans or activities that constitute a threat of violating F.A.C.E. Many of the events the District Court relied upon in its findings are years old—some even pre-dating the passage of F.A.C.E. in 1994. Courts may not use past conduct to place a permanent burden on the exercise of First Amendment rights. When a district court contemplates imposing an injunction based in part on a past history of illegal behavior by protestors, it should be vigilant to ensure that the current protests threaten to maintain whatever coercive influence resulted from the original illegal conduct. *See Milk Wagon Drivers Union of Chicago v. Meadowmoor Dairies, Inc.,* 312 U.S. 287, 296, 61 S.Ct. 552, 85 L.Ed. 836 (1941).

■ When issuing an injunction, a district court's findings should definitively confirm that injunctive relief is necessitated by current and ongoing plans or activities, and that all named defendants are currently engaged in the plans or activities that constitute a threat of violating F.A.C.E. In Warren's case, the District Court's findings did not do so. These

failures require us to vacate the injunction against Warren insofar as F.A.C.E. provides the authority for the court's injunctive power.

We are faced, however, with a third difficulty: the District Court never made findings of fact concerning Warren's then-alleged violations of the T.R.O. While we agree with Warren that the District Court enjoined him without an adequate basis for concluding that he likely violated F.A.C.E., the District Court's failure to make findings of fact on this material evidence may have prevented the plaintiffs from meeting their burden of showing likelihood of success on the merits. By reserving the issues for separate contempt proceedings, the District Court denied the plaintiffs an opportunity to introduce critical evidence in support of their claim that Warren could reasonably be expected to repeat the actions he undertook during the pre-F.A.C.E. rescue missions.

At least on the record before us, F.A.C.E. does not provide grounds for enjoining Warren. The state law claims of public nuisance and trespass, which we will now discuss, do not provide any firmer support for injunctive relief against him. We are therefore required to vacate the injunction against Warren and remand for additional proceedings consistent with this opinion. Those additional proceedings should include a full consideration of Warren's alleged violations of the T.R.O.

## 2. New York Law Claims of Public Nuisance and Trespass

■ As an alternative ground for injunctive relief, the District Court found that the defendants violated New York state public nuisance and trespass law. Neither of these provide grounds for enjoining Warren.

---

**9.** This aspect of the injunction was not challenged on appeal.

Pursuant to New York law, "a public nuisance 'consists of conduct ... which [offends or interferes with] the public in the exercise of rights common to all, in a manner such as to ... interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons.'" *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1361 (2d Cir.1989) (quoting *Copart Indus., Inc. v. Consol. Edison Co.*, 41 N.Y.2d 564, 568, 394 N.Y.S.2d 169, 172, 362 N.E.2d 968, 971 (1977)), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990). A public nuisance may be caused by protest activities at health clinics that endanger "the health and security of a considerable number of persons." *Terry*, 886 F.2d at 1362. In *Terry*, the illegal conduct included mass demonstrations that obstructed vehicular and pedestrian traffic, making clinic access uncertain and precarious. *Id.*

In general, the nuisance claim in this case rides "piggyback" on the F.A.C.E. claim. The types of behavior that impeded clinic access also created a nuisance by interfering with the administration of medical care at health clinics. As with F.A.C.E., the nuisance case against Warren is short on details. The District Court did not discuss Warren's current protest conduct, and narrates no recent instance in which Warren created a public nuisance. Based on this record, New York public nuisance law cannot support a preliminary injunction against Warren. The state law claim suffers the same infirmities as the F.A.C.E. claim. It is possible that the District Court, on remand, might conclude that Warren's actions in violation of the T.R.O. created a public nuisance, justifying injunctive relief. But on the record before us, we cannot sustain the injunction based on public nuisance.

Nor does New York state trespass law provide a suitable basis for injunctive relief against Warren. Under New York law, "trespass is the interference with a person's right to possession of real property either by an unlawful act or a lawful act performed in an unlawful manner." *Terry*, 886 F.2d at 1361 (2d Cir. 1989) (citing *Ivancic v. Olmstead*, 66 N.Y.2d 349, 352, 497 N.Y.S.2d 326, 488 N.E.2d 72 (1985), *cert. denied*, 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 658 (1986) and *Phillips v. Sun Oil Co.*, 307 N.Y. 328, 331, 121 N.E.2d 249 (1954)). "The threat of continuing trespass entitles a property owner to injunctive relief where irreparable injury may result." *Terry*, 886 F.2d at 1361 (citing *Exchange Bakery & Rest. v. Rifkin*, 245 N.Y. 260, 268, 157 N.E. 130 (1927)).

Initially, this cause of action appears the strongest basis for injunctive relief against Warren. He has, after all, been convicted of trespassing on the property of Genessee Hospital on several different occasions. Setting aside the question of whether trespass would justify such a broad injunction, or whether Warren's sporadic trespasses constitute a continuing violation posing a risk of irreparable injury, we find the trespass claim inadequate for one fundamental reason. The victim of the trespasses, Genessee Hospital, is not a party to this action, and so the plaintiffs cannot assert a cause of action under New York law for trespass on property owned and used entirely by another. *See, e.g., Terry*, 886 F.2d at 1361 ("The threat of continuing trespass entitles *a property owner* to injunctive relief where irreparable injury may result.") (emphasis added); *see also N.Y. State Energy Research & Dev. Auth. v. Nuclear Fuel Serv., Inc.*, 561 F.Supp. 954, 968 n. 3 (W.D.N.Y.1983) ("[I]njunctive relief if otherwise appropriate will be available purely to vindicate *the*

*possessor's interest* in the property.") (emphasis added). In *Terry,* for example, the plaintiffs seeking injunctive relief were themselves the victims of trespasses by the defendants.

Neither F.A.C.E. nor the state law causes of action support the injunction against Warren. We therefore vacate the injunction against him and remand for additional proceedings consistent with this opinion.

## II. CONSTITUTIONALITY OF THE INJUNCTION

The record establishes that injunctive relief against Melfi is appropriate to protect access to reproductive health facilities in the Western District of New York. We now turn to an examination of the terms of the injunction against her. The First Amendment requires that "the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Schenck v. Pro–Choice Network of Western New York,* 519 U.S. 357, 372, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (quoting *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994)).

Melfi argues that we should apply one of the more stringent tests for content-based injunctions or for prior restraints. This contention is without merit. It is well settled that an injunction of this nature (*i.e.,* directed at protestors outside of abortion clinics but based on their unlawful behavior) is content-neutral. *See Schenck,* 519 U.S. at 373–74, 117 S.Ct. 855; *Madsen,* 512 U.S. at 762–64, 114 S.Ct.

2516; *see also Hill v. Colorado,* 530 U.S. 703, 719–20, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (applying same rule to review of a statutory restriction on protest activities at health care clinics). Nor is such an injunction a prior restraint. *See Schenck,* 519 U.S. at 374 n. 6, 117 S.Ct. 855; *Madsen,* 512 U.S. at 763 n. 2, 114 S.Ct. 2516; *see also Hill,* 530 U.S. at 733–34, 120 S.Ct. 2480.

There is also little question that this type of injunction serves significant governmental interests.[10] *See, e.g., Madsen,* 512 U.S. at 767–68, 114 S.Ct. 2516. The articulated public interests supporting the 2000 Injunction are: (1) ensuring public safety and order; (2) protecting freedom to receive reproductive health services; (3) advancing medical privacy and the well-being of patients seeking care at facilities; and (4) safeguarding private property.

These are significant governmental interests, capable of supporting injunctive restrictions on protest behavior. The 1992 Injunction imposed fixed fifteen-foot buffer zones around clinic doorways, driveways, and parking lot entrances. *See Schenck,* 519 U.S. at 380–81, 117 S.Ct. 855. The injunction was upheld by the set of governmental interests similar to those asserted here: "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services." *Id.* at 376, 117 S.Ct. 855. Other cases have upheld injunctions regulating protest activities at health clinics in order to serve a

---

**10.** Contrary to the defendants' claim, the private cause of action does not limit the governmental interests that may be properly asserted to support the injunction. "[I]n assessing a First Amendment Challenge, a court looks not only at the private claims asserted in the complaint, but also inquires into the governmental interests that are protected by the injunction...." *Schenck,* 519 U.S. at 375, 117 S.Ct. 855. Moreover, the injunction in this case is sought by the State of New York, so plaintiffs assert more than private causes of action.

similar set of interests. *See Madsen,* 512 U.S. at 768–73, 114 S.Ct. 2516; *see also Hill,* 530 U.S. at 715, 120 S.Ct. 2480 (finding an even narrower set of governmental interests sufficiently significant to justify a statutory "no-approach" zone within one hundred feet of clinic entrances).

Melfi's main constitutional objection to the District Court's injunction is that it is overly expansive, thereby unlawfully limiting her First Amendment rights. The injunction provisions must "burden no more speech than necessary" to serve the significant interests. *Schenck,* 519 U.S. at 372, 117 S.Ct. 855 (quoting *Madsen,* 512 U.S. at 765, 114 S.Ct. 2516). Specifically, Melfi challenges three provisions: the expanded buffer zones at Buffalo Gyn Womenservices and Planned Parenthood Rochester; the elimination of the sidewalk-counselor exception; and the ban on the use of sound amplification devices. We review each one in turn.

## A. Expanded Buffer Zones

■ In addition to enjoining Melfi from protesting within fifteen-foot buffer zones at all covered facilities in the Western District, the District Court enjoined her from protesting within extensive buffer zones at two facilities: Planned Parenthood Rochester ("PPR") and Buffalo Gyn Womenservices ("BGW"). She challenges these larger buffer zones. Although we agree that picketing activity at the sites has interfered with clinic access, thus meriting the continuation and modification of buffer zones, the enlargements by the District Court are more extensive than necessary to effectuate the articulated state interests and thus violate the First Amendment.

## 1. Buffalo Gyn Womenservices ("BGW")

BGW is a medical facility providing reproductive health services, including abortions and a range of counseling services. The facility is one of three businesses located on the western side of Main Street between Greenfield and Fairfield Streets in Buffalo, New York. To BGW's south is a dry-cleaning business on the corner of Greenfield Street whose patrons use a "sidewalk parking area" when they drop off and pick up clothes.[11] The BGW facility has a twenty-foot wide driveway squeezed between its building and the dry-cleaning establishment. The driveway leads to a parking lot and BGW's rear entrance. About sixty feet separate the BGW driveway from BGW's front entrance on Main Street, and a city bus makes regular stops along this strip of sidewalk. BGW's northern neighbor is a Sunoco gas station, which occupies the corner at the intersection of Fairfield and Main Streets. A lengthy sidewalk surrounds the gas station, and the area is largely dedicated to driveways so that cars can easily enter and exit the business.

Aside from discussing blockades in 1992 and 1993, the District Court did not specify the extent of more recent protest activity at BGW except to describe the behavior of particular protestors who have proven disruptive. The District Court did not state whether protest activity had continued with the size or ferocity seen in the early 1990s, but the District Court's findings of fact support the conclusion that protest activity, though still highly emotional and intense, has subsided at least in size and unmanageability.

The District Court constructed a significantly expanded no-protest buffer zone at BGW. The new buffer zone runs along

---

11. The neighboring businesses are not parties to this suit.

most of the BGW side of Main Street between Greenfield and Fairfield Streets. It begins at a point sixty feet south of the BGW driveway, in front of the dry cleaner, and ends fifty-eight feet north of BGW, in front of the Sunoco gas station. The zone thus includes the entire public sidewalk in front of BGW. The District Court further enjoined protest activities within any gas station driveways that fall outside of the buffer zone.

The District Court justified the expansion by a piecemeal analysis of the zones' different parts. The buffer zone in front of the dry-cleaner permits customers to safely park on the sidewalk in order to drop off laundry. The zone in front of BGW permits clear and easy access to the facility, both via its driveway and its pedestrian entrance, and also moves noisy protestors further away from the building. By alleviating congestion along the sidewalk, the zone also makes it easier for bus riders to access the bus stop in front of the clinic. The final stretch of no-protest area permits easy and safe access to the Sunoco gas station. Moreover, the entire buffer zone permits shoppers, school children, and any other pedestrians to use the sidewalk without impediment. By removing the distracting protestors, traffic accidents along Main Street are also less likely.[12]

Despite the laudatory goals of the expanded injunction, we hold that the larger buffer zone is unconstitutional. The zone

imposes a severe burden on First Amendment rights by effectively preventing protestors from picketing and communicating from a normal conversational distance along the public sidewalk on Main Street near BGW. Though some limitations are necessary in light of the abusive behavior at BGW, only the buffer zones immediately around entrances and driveways are narrowly tailored to ensure clinic access and to burden no more speech than is necessary.

Although previous cases have set no outer limit on the size of buffer zones, we do note that the dimensions of the buffer zone created by the District Court are larger than those upheld in the past. The Supreme Court has previously reviewed and sustained court-made buffer zones of fifteen feet at these sites, relying on its earlier approval of thirty-six-foot buffer zones at reproductive health clinics. *Schenck,* 519 U.S. at 380, 117 S.Ct. 855 (fifteen-foot zones); *Madsen,* 512 U.S. at 757, 114 S.Ct. 2516 (thirty-six-foot zones). The BGW zone is nearly double the size of the *Madsen* zones, extending sixty feet south of BGW's driveway toward Greenfield Street and fifty-eight feet north of the BGW building toward Fairfield Street. The resulting buffer zone stretches over 200 feet, more than doubling the dimensions of the old zones.[13]

Above all, we strike down the enlargements because they are unnecessary. Our

12. The District Court implied that, because of the sidewalk's heavy use, protests along this sidewalk are more prone to impede or distract pedestrian and vehicular traffic than those in other areas, such as the sidewalk across the street.

13. During the height of the pro-life "rescue" campaigns, the Third Circuit upheld a five hundred-foot zone at one clinic, but permitted picketing and a stationary table staffed by six people in the "areas of public property that are the closest to the [clinic's] entrance."

*Northeast Women's Ctr., Inc. v. McMonagle,* 939 F.2d 57, 64 (3d Cir.1991) (emphasis omitted). Upon close analysis, even this buffer zone is more lenient than the ones under review. Although we are uncertain about the size of BGW protests, the record is clearer regarding PPR, the other site where the District Court found it necessary to impose larger buffer zones. Typically, the number of protestors at PPR is quite small. A stationary table exception would permit almost the entire group of demonstrators within the zone.

review of the evidence indicates that clinic access at BGW is preserved by application of the old fifteen-foot buffer zones. Almost all evidence pointing to the inadequacy of the 1992 Injunction involved one of two situations. First, a group of defendants who are named for the first time in this action, flouted the rules of the 1992 Injunction because the injunction did not name them. Advancing a questionable legal theory, they maintained that because it did not name them, its terms did not bind them.[14] Alternatively, protestors invoked the sidewalk-counselor exception to engage in disruptive behavior within fifteen feet of clinic entrances and driveways. Aside from these abuses, the old buffer zones were sufficient. Moreover, activity in the driveways of these clinics caused the most serious traffic hazards. The 2000 Injunction will eliminate both of these abuses even absent the buffer zone enlargements. It names the protestors regularly involved in disruptive protests in the Western District. Further protecting clinic access, it eliminates the sidewalk-counselor exception and, with it, the porousness that plagued the old buffer zones.[15]

In addition to being unnecessary, the larger buffer zones have significantly curtailed the exercise of First Amendment rights in the public areas around BGW. The zones effectively remove the protestors from anywhere near BGW and force them either down the block or across Main Street—a road with four lanes of active traffic. The District Court found that the protestors "still yell and scream and can be clearly heard outside the clinic" and therefore are able to communicate their message effectively. Although relevant, that conclusion understates the injunction's effect on free speech. The new zones sharply curtail the possibility of communication between pedestrians and protestors on this large swath of public sidewalk along Main Street.

Such a broad prohibition on free speech at BGW's old location was previously rejected by the Supreme Court in *Schenck*.[16] The 1992 Injunction included "floating" buffer zones which required that protestors stand fifteen feet from people or cars seeking access to clinics, but which otherwise allowed protestors to stand near health clinics. *See Schenck*, 519 U.S. at 367, 117 S.Ct. 855. The provision, though more lenient than the outright ban on protests near BGW in the 2000 Injunction, nonetheless had the effect of preventing demonstrators from picketing on the sidewalk near the old BGW. "[A]ttempts to stand 15 feet from someone entering or leaving a clinic and to communicate a message—certainly protected on the face of the injunction—will be hazardous if one wishes to remain in compliance...." *Id.* at 378, 117 S.Ct. 855. Given that the sidewalk in front of BGW's old location was only seventeen feet wide, the room to maneuver was limited. *Id.* Since protestors

---

14. Melfi's claim that the injunction did not bind her has a shaky legal foundation. The 1992 Injunction did bind those acting in concert with named defendants, and Melfi may have thus been covered. Nonetheless, both plaintiffs and defendants maintain that because the 1992 Injunction did not name protestors who began protesting after that date, some of the current protestors insist that they can ignore the 1992 Injunction provisions. That apparent deficiency is remedied by the 2000 Injunction.

15. We discuss and uphold the District Court's elimination of the sidewalk-counselor exception below.

16. Although the original buffer zones were approved for its facility, BGW moved to its present location in or about late 1994. Later in this opinion, we consider minor modifications to the baseline buffer zones which are necessitated by the particular characteristics of this new site.

might react by refraining from expressive activity near BGW even when that activity poses no obstacle to clinic access, the Supreme Court struck down the floating zones. *Id.* at 379, 117 S.Ct. 855.

In the case of the enlarged buffer zones in the 2000 Injunction, we need not engage in any sophisticated analysis of how the zones might chill protest activity on the public sidewalk at BGW. The new injunction does not chill this type of interaction—it effectively bans it. Like the 1992 protestor worried about compliance, the 2000 protestor must stand far and clear of the BGW facility. What the 1992 Injunction caused indirectly, the 2000 Injunction accomplishes with direct action: the effective prohibition of close range communication in public areas near BGW.

Concerning the 1992 Injunction, the *Schenck* Court held that such a separation between protestors and individuals entering clinics "cannot be sustained" on the record before it. *Id.* at 377, 117 S.Ct. 855. Without meaning to minimize the significant difficulties created by current protest activity at BGW, the pattern of illegal behavior in 2000 is a shadow of that faced by clinics in 1990, when the original complaint was filed. At the time, clinics suffered through "numerous large-scale blockades." *Id.* at 362, 117 S.Ct. 855. As part of their strategy to stop and disrupt clinic operations, protestors "trespassed onto clinic parking lots," "sometimes threw themselves on top of the hoods of [oncoming] cars," and "milled around doorways and driveway entrances." *Id.* at 363–64, 117 S.Ct. 855. These "constant protests" over-

whelmed the local police, who "had been unable to respond effectively." *Id.* at 364, 117 S.Ct. 855. The 2000 Injunction targets a pattern of illegal activity that lacks this ferocity. Although protestors still "crowd" and shout at oncoming cars and patients, police are no longer overwhelmed by their behavior. The most egregious acts, such as the illegal practice of staging "large scale" blockades, are largely gone. If the 1990 record was insufficient to sustain an indirect ban on communicative activity at BGW, then the record here must be insufficient to support an even greater incursion on First Amendment activities.[17]

■ The viability of injunctive restrictions on speech activity often rises and falls on its overall effect on free speech activities. On this point, *Hill v. Colorado*, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), is instructive. The *Hill* Court upheld a Colorado statute imposing eight-foot no-approach zones when protestors were trying to communicate within one hundred feet of health care facilities. In part, the statute survived constitutional review because it left "open ample alternative channels of communication." *Id.* at 726, 120 S.Ct. 2480. From a distance of eight feet, people entering clinics could read protestors' placards, *id.;* a speaker could "communicate at a 'normal conversational distance,'" *id.* at 726–27, 120 S.Ct. 2480 (quoting *Schenck,* 519 U.S. at 377, 117 S.Ct. 855); and a leafletter could stand "near the path of oncoming pedestrians and proffer[ ] his or her material, which the pedestrian can easily accept," *id.* at 727, 117 S.Ct. 855. No such opportunities

---

**17.** In fact, cases upholding anti-picketing injunctions at reproductive health clinics have frequently involved more lenient injunctions in order to remedy more egregious patterns of conduct. *See, e.g., United States v. Scott,* 187 F.3d 282, 284–86 (2d Cir.1999) (enjoining demonstrator who repeatedly violated past injunctions and engaged in numerous violent confrontations, from protesting in twenty-eight-foot fixed buffer zones and eight-foot floating zones); *N.Y. State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1344–45 (2d Cir.) (involving repeated blockades leading to hundreds of arrests), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1989).

are present at BGW under the 2000 Injunction.

Upon review of other cases affirming buffer zones outside of health care clinics, it is clear that the injunctions in those cases preserved greater opportunity for protestor communication than is available under the terms of the 2000 Injunction. We disagree with the plaintiffs' contention that the injunction in *Madsen* had a similar effect on free speech near the clinics at issue. In support of their view, the plaintiffs note that the thirty-six-foot zones upheld there required protestors to stand in front of neighboring properties or across the street. *See Madsen,* 512 U.S. at 770, 114 S.Ct. 2516. But the clinic in *Madsen* sat on a "narrow street" of twenty-one feet. *Id.* at 769–70, 114 S.Ct. 2516. The zone separated protestors from cars approaching or leaving the clinic by "no greater than 10 to 12 feet." *Id.* at 770, 114 S.Ct. 2516. The size of the protests were apparently larger than those at BGW. *Id.* at 758, 114 S.Ct. 2516. Moreover, the Supreme Court concluded that "[t]he state court seems to have had few other options to protect access given the narrow confines around the clinic." *Id.* at 769, 114 S.Ct. 2516. Because BGW is positioned on a four-lane road in a commercial area, and the District Court has adequate alternatives,[18] a broad injunction is less necessary and more damaging than in *Madsen.*

■ The buffer zones in front of the neighboring dry-cleaning business and gas station are particularly suspect. As buffer zones extend further and further from clinic entrances, their relationship to guaranteeing clinic access becomes more attenuated and the zones require more vigorous review. In *Madsen,* the Supreme Court

upheld thirty-six-foot buffer zones protecting clinic entrances and parking lots, but struck down similarly-sized buffer zones protecting adjacent parcels of property. *Id.* at 769, 771, 114 S.Ct. 2516. The Court rejected the buffer zones along the property lines of clinic neighbors absent a showing "that petitioners standing on the private property have obstructed access to the clinic, blocked vehicular traffic, or otherwise unlawfully interfered with the clinic's operation...." *Id.* at 771, 114 S.Ct. 2516. We too reject such buffer zones in front of the neighboring businesses, particularly where as here the evidence strongly supports the conclusion that clinic access is hampered only by protestor behavior in clinic driveways and in front of clinic entrances.

The plaintiffs insist that the zones in front of neighboring businesses are necessary to prevent a public nuisance, if not to protect clinic access. Indeed, the District Court justified these additional no-protest areas by noting that pedestrians use the street, bus riders use the bus stop, and community members bring business to the dry-cleaner. They contend that this busy urban walkway cannot tolerate picketing.

■ We find this argument unconvincing, and believe that this use of nuisance law for such a broad prohibition of protest activities raises profound constitutional issues. The fact that Main Street is a congested pedestrian walkway makes it more, not less, apt for First Amendment protections. A public forum may be "an appropriate place for expressing one's views precisely because the primary activity for which it is designed is attended with noisy crowds and vehicles, some unrest and less

---

**18.** Although the current fifteen-foot zones are adequate to protect clinic access, the District Court does have other tools which might preserve order with a more minimal impact on free speech. Such tools include limiting the number of protestors on various portions of the sidewalk.

than perfect order." *Wolin v. Port of N.Y. Auth.*, 392 F.2d 83, 90 (2d Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968). Patrons of the drycleaning establishment may find that they have to park around the corner, or expect a short delay as they make their way to the store entrance. They may have to drive more carefully, and avoid pulling their cars up and onto the sidewalk too quickly. Such trips may be less routine because they find themselves confronted with opinions that anger them. Under our constitutional system, however, government may not sanitize our public places of such protest activity. "The framers of the Constitution opted for the disharmony of controversy because they believed that in that unrest lay the best prospect of an ordered society." *Wolin*, 392 F.2d at 91. While narrow regulations may sometimes be necessary, they must be supported by more than a few stories of near-miss traffic accidents and frustrated customers, particularly where such regulations impair free speech as severely as the no-protest zone here. When linked together, the reasons invoked for these incremental increases in the buffer zones' dimensions form too weak a chain to support the weight of this substantial burden on First Amendment activities.

■ The District Court should have responded to the problems of protestors blockading the sidewalk, so that pedestrians cannot pass, by enjoining such behavior directly. In fact, the injunction already contains such a provision that forbids "blocking, impeding or obstructing ingress to or egress from" covered facilities by, for example, lining up shoulder-to-shoulder along the sidewalk outside of those clinics. On remand, the District Court should extend such protection to pedestrians who seek to use the public sidewalks in front of covered facilities, so that protestors are enjoined from "blocking, impeding or obstructing" pedestrians who seek to walk along the public sidewalks in front of covered facilities.[19]

■ We do think that three slight alterations to the zone imposed by the new injunction should be maintained to further strengthen the zone's effectiveness, especially as the alterations have a minimal effect on First Amendment freedoms at BGW. First, in regard to the buffer zone around the pedestrian entrance to BGW, the 1992 Injunction created a roughly semicircular arc with a fifteen-foot radius measured from the doorway. Because the zone extended out only fifteen feet from the doorway, the zones did not cover the entire nineteen-foot wide sidewalk in front of the clinic. Though only a four-foot wide stretch at its thinnest point remained along the edge of Main Street, protest activity there caused great disruption. The new zone is also measured from points fifteen feet to the north and south of the doorway, but it encompasses the entire width of sidewalk in front of the BGW doorway. In other words, the new zone is rectangular in shape, rather than semicircular, a slight difference that will greatly strengthen the effectiveness of the zone.

■ The second alteration concerns the city bus stop, including a bench, that sits on the border of the driveway buffer zone. The record demonstrates that protest activity in this area created difficulties for patients and commuters attempting to use this public transit stop. A slight modification of the zone, so that it bars protest activity within three feet of the bus stop

---

19. As discussed below, a narrow no protest passageway—rather than the District Court's broad prohibition—should suffice to eliminate any doubt that protest activity may continue along Main Street without hindering pedestrian use of the walkway.

sign and bench,[20] increases that effectiveness of the clinic zones without imposing any real, additional burden on First Amendment activity.

■ Finally, a narrow no-protest corridor (measured three feet from the BGW building facade) connecting the driveway and front-entrance buffer zones will alleviate crowding problems that interfere with pedestrians or bus riders seeking to walk along the sidewalk in front of BGW. *Cf. United States v. Scott*, 187 F.3d 282, 291 (2d Cir.1999) (Leval, J., dissenting). Such a narrow passageway has none of the constitutional dangers inherent in the total ban on protestor activity in front of BGW. None of these three modification entails a significant or extraordinary expansion of the baseline buffer zones approved in *Schenck*. Instead, they constitute minor alterations as necessitated by the unique physical conditions of the BGW site. Accordingly, the modifications do not offend the First Amendment.

This record leaves little doubt that clinic access will be preserved by the old fifteen-foot buffer zone, modified only to include the strip of sidewalk at the edge of the clinic entrance, the Main Street bus stop near the BGW driveway, and the corridor along BGW's facade. While remaining mindful that the role of an appellate court is not to quibble over whether slightly smaller zones would suffice, *see Schenck*, 519 U.S. at 381, 117 S.Ct. 855, we note that every incremental expansion in the size of buffer zones brings smaller benefits to pa-

tients and clinics, with greater injury to free speech. At some point, the balance shifts decisively. The buffer zones at BGW passed that point when the goal shifted from only prohibiting behavior that blocks clinic access to eliminating a range of behavior that creates disorder. As one might expect, when the injunction began serving these broader goals, free speech suffered.[21]

Accordingly, the provisions of the injunction against Melfi that expand the size of the BGW buffer zones, except for the slight modifications described above, are vacated.

## 2. Planned Parenthood Rochester ("PPR")

■ For substantially similar reasons, we also vacate the provisions of the injunction against Melfi that expand the buffer zones at PPR. We uphold only those parts of the zone tailored to protect access to clinic entrances and driveways.

Like BGW, PPR is a medical facility providing reproductive health services, including abortions and a variety of counseling services. It is located along University Avenue between North and Scio Streets in Rochester, New York. Patients and clinic staff approaching PPR from University Avenue can enter in one of two ways. By car, they can turn into PPR's driveway and park in its parking lot. By foot, they can turn onto PPR's pedestrian walkway and

---

**20.** The materials submitted to this Court do not give us precise measurements of the position of the driveway buffer zone and the bus stop area. We intend for the bus stop buffer zone to be rectangular in shape, and to connect with the driveway buffer zone. Accordingly, the District Court may extend the zone further than three feet in the direction of Greenfield Street if necessary to connect with the driveway buffer zone.

**21.** It is also noteworthy that the expansion of the injunction is sometimes justified by reference to activities which violate the old injunction. We encourage district courts to enforce the terms of existing injunctions rather than draw up more draconian limitations. We recognize that in some cases, an existing injunction's provisions make enforcement difficult and require change. That, however, does not appear to be the case here.

proceed to the main entrance which is set back from the street.

Prior to the 2000 Injunction, protestors would gather on the sidewalk running along the parking lot. In the course of this activity, they often walked in front of cars entering and exiting through the driveway. Such gatherings also placed them in front of the pedestrian walkway. Although the District Court did not specify the typical size and frequency of protests, the record indicates that protests were apparently limited in size but held regularly. Each Tuesday night, fewer than ten demonstrators would gather for approximately four hours. Similar demonstrations were held on Saturday mornings with fewer than a dozen protestors participating. The largest monthly protest involved as many as 150 protestors praying the rosary and marching for about one hour in a "rosary rally."

In order to clear PPR's entryways of protestors, the District Court extended the buffer zone to include much of the sidewalk bordering the facility. The no-protest zone begins at a point twenty-five feet to the north (*i.e.*, toward North Street) of the PPR driveway. It then runs south along the sidewalk running past a stretch of grass, the twenty-foot wide driveway, another stretch of grass, the pedestrian walkway,[22] and a third fifteen-foot stretch of grass, and ends at a point fifteen feet south (*i.e.*, toward Scio Street) of the PPR building. The last fifteen-foot stretch runs adjacent to the PPR wall, which appears to be about two stories high. In other words, over one hundred feet of sidewalk all along the PPR facility is a no-protest zone, except for an area that, when viewed from the PPR parking lot, is behind a two-story solid brick wall. As a result, demonstrators now protest across the street.

Our analysis of the PPR enlargements substantially tracks our treatment of the BGW zones. The evidence allegedly supporting enlargement largely consisted of behavior that would be prohibited by application of the old fifteen-foot zones. This included evidence that protestors obstructed pedestrians as they attempted to pass by or enter PPR. It also includes evidence that protestors interfered with traffic along University Avenue. Most of those traffic problems, however, apparently occurred as a result of protest activity within the PPR driveway area. Moreover, the new injunction, even if limited to fifteen feet, would be strengthened by the same features present at BGW: the elimination of the sidewalk-counselor exception and application of the injunction to the named defendants in this action. At least on this record, the injunction against Melfi at PPR is vacated to the extent it enlarges the old fifteen-foot zones.

### B. Elimination of the Sidewalk–Counselor Exception

 Melfi also appeals the District Court's decision to ban her from acting as a "sidewalk counselor" within the buffer zones, and she urges us to reinstate the exception as provided by the 1992 Injunction, but eliminated in the 2000 Injunction. Crafted by the District Court in an effort to accommodate protest activity at subject medical facilities, the sidewalk-counselor exception permitted two protestors to enter the buffer zones for the purpose of "sidewalk counseling consisting of conversation of a non-threatening nature." When the Supreme Court reviewed the 1992 Injunction it concluded that the sidewalk-counselor exception was not necessary for the buffer zones to survive constitutional scrutiny. *See Schenck,* 519 U.S. at 381 n. 11, 117 S.Ct. 855. Other buffer zones

---

**22.** From diagrams, it appears that this walk- way is over fifteen feet wide.

that have passed constitutional muster did not include any sidewalk-counselor exception. *See, e.g.*, *Madsen*, 512 U.S. at 757, 114 S.Ct. 2516.

Besides being a constitutionally unnecessary accommodation, the sidewalk-counselor exception has also proven to disrupt clinic access and complicate enforcement of the injunction. In fact, insofar as protestors have disrupted clinic access in the Western District of New York, the sidewalk-counselor exception has been a primary tool used to facilitate disruptive behavior. In part, protestors abused the limited exception, which permitted only two protestors within buffer zones, by flooding the zones with many protestors. At times, the sidewalk counselors would stand in driveways and block traffic. Protestors also took advantage of the exception to stand within buffer zones even when there were no patients to counsel. When patients were present, the "sidewalk counselors" shouted at them through bull horns, notwithstanding that the exception permitted only "conversation of a non-threatening nature." Based on this record, the District Court found that protestors used the zones to make ingress and egress unreasonably difficult. We further note that the clarity of a nonporous no-protest zone will help police violations of the District Court's order.

Even with the elimination of the sidewalk counselor exception, protestors will still be able to stand along the sidewalks outside of the buffer zones, picketing and praying and passing out materials. In light of the evidence indicating that the exception was logistically unsupportable, the amendment to exclude all protestors from the area immediately around entrances and driveways is narrowly tailored to serve the government interest in protecting clinic access. Accordingly, we uphold this aspect of the injunction against Melfi.

### C. Ban on Sound Amplification Equipment

■ The injunction forbids Melfi and the other defendants from using sound amplification devices in protests at facilities providing reproductive health services, "including any hospital, clinic, physician's office or other facility that provides medical, surgical, counseling or referral services relating to the human reproductive system." Primarily, the District Court explained that this provision prevents the use of devices which enable protesters to be heard inside of clinic facilities. It is unclear whether this is a blanket ban which prohibits the use of all amplification devices at all covered facilities, or simply a ban in those instances where such devices would "injure, disturb or endanger patients or employees" of such facilities.[23] Because the injunction already bans the making of excessively loud noises, the reference to sound amplification equipment would be redundant unless interpreted as a blanket ban. We therefore address it as such.

---

**23.** Indeed, the injunction appears to ban the use of sound amplification devices by the defendants *anywhere*. The provision states that the defendants are:

Enjoined and restrained from: ... (E) using any mechanical loudspeaker or sound amplification device, including but not limited to megaphones, bullhorns, and electric amplifiers, or making any excessively loud sound which injures, disturbs, or endangers the health or safety of any patient or employee of any such facility....

We have previously affirmed a provision substantially similar to the ban on the making of excessively loud noises, *see Pro–Choice Network v. Schenck*, 67 F.3d 359, 373 (2d Cir. 1994), and Melfi has not challenged that prohibition here. Our discussion is therefore limited to the ban on the use of sound amplification devices.

As a blanket ban on the use of sound amplification equipment, the injunction burdens more speech than necessary to achieve its goals. The District Court did not make site-by-site findings concerning the use of megaphones at covered facilities, and only referenced specific noise problems at PPR, BGW, and a third site called Greece Planned Parenthood. The Decision and Order sets forth no finding that suggests that, because such devices cause problems at some sites, they interfere with care at all sites. Several factors indicate that a site-by-site analysis of the propriety of megaphone use is more appropriate: different facilities might have buildings at varied distances from public sidewalks and protestors; the location of rooms in which care is given might differ from facility to facility; the quality of construction might vary; and the injunction covers distinct types of medical facilities, some that only make referrals to reproductive health clinics. The District Court's blanket prohibition, lacking the support of particularized findings as to how the use of devices at particular sites affects the administration of health care, is inadequate. *Cf. Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 81 (2d Cir.2001) (requiring particularized findings, rather than a blanket prohibition, where particular factors may influence the legality of enjoined behavior). The provision is not narrowly tailored to achieve its goal, and is thus vacated and remanded for additional findings and refinement so that any ban only applies to those sites requiring such additional noise control.

## CONCLUSION

For the foregoing reasons, we affirm the grant of the preliminary injunction against defendant Mary Melfi, including the imposition of buffer zones at all covered facilities in the Western District of New York, the elimination of the "side-walk counselor" exception, and certain minor modifications to the buffer zones at Buffalo Gyn Womenservices. We vacate the injunction against Melfi, however, insofar as it imposes expanded buffer zones at Planned Parenthood Rochester and Buffalo Gyn Womenservices, and bans the use of sound amplification equipment at all facilities. In those respects, we remand to the District Court for further proceedings consistent with this opinion. We also vacate the injunction against Michael Warren, and remand for additional proceedings consistent with this opinion.

The parties shall bear their own costs on this appeal.